PER CURIAM.                                                Error.

WILMINGTON AND WELDON RAILROAD CO. v. JOHN A. REID.

A charter, granted in 1833, provided that all the property purchased by the officers of the company should vest in the shareholders "in proportion to their respective shares, and the shares shall be deemed personal property ; and the property of said company and the shares therein, shall be exempt from any public charge or tax whatsoever" : *Held*, that the Legislature might, notwithstanding, in 1869, levy an *ad valorem* tax upon the *franchise*.

(*R. & G. R. R. Company* v. *Reid, ante*, 155, cited and approved.)

MOTION to vacate an injunction, made before *Watts, J.*, January 18 1870, at Chambers, HALIFAX Court.

The facts were as in the case, *ante*, 155. The provision in the charter, (1833) under which an exemption was claimed is: "All the property purchased by the said President and Directors, and that which may be given to the company, and the works constructed under authority of this Act, and all profits accruing on the said works and the said property, shall be vested in the respective shareholders of the company, in proportion to their respective shares; and the shares shall be deemed personal property ; and the property of said company, and the shares therein, shall be exempt from any public charge or tax whatsoever."

His Honor declined to vacate the former order, and the defendant appealed.

*Attorney General, Bragg and Battle & Sons* for the appellant.

*Moore,* with whom were *Fowle & Badger, contra.*

1. The charters of the Railroad Companies are compacts or contracts by statute between the State and Stockholders, and cannot be changed without the consent of each party; and such rights as are legally vested in the companies cannot be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved in the acts of incorporation: *Wales* v. *Stetson,* 2 Mass. Rep. 143; *Enfield Toll-Bridge Co.* v. *Conn. River Co.,* 7 Con. Rep. 28-53; *Fletcher* v. *Peck,* 6 Cr. 87; *St. B'k. of Ohio* v. *Knoop,* 16 How. at 389; *Town of Pawlet* v. *Clark,* 9 Cr. 292; *Terrett* v. *Taylor,* Id. 43; *Dartmouth College* v. *Woodard,* 4 Wh. 518; *Mills* v. *Williams,* 11 Ire. 558–opinion 561–2; *B'k. of the State* v. *B'k. C. Fear,* 13 Ire. 75.

2. Where there is no stipulation by the sovereign against taxation, taxes may be laid; *Prov. B'k.* v. *Billings,* 4 Pet. 514; *State* v. *Petway,* 2 John. Eq. 306.

3. Where there is such a stipulation, it is entitled to a sensible construction so as to effect its obvious purpose, and shall be regarded as a contract, if so intended; *St. B'k. of Ohio* v. *Knoop,* 16 How. 369; *Ohio L. and T. Co.* v. *Debolt,* 18 How. 416; Taney's opinion at p. 322; *Bk. C. Fear* v. *Edwards,* 5 Ire. 516, opinion; *Gordon* v. *Appeal Tax Court,* 3 How. 148.

4. A sufficient consideration for all grants by the sovereign is always presumed, and is ever valid until it may be vacated for fraud or other good reason, which must be done in a judicial proceeding:

Consideration for its acts being always presumed, the words of grant are to be construed alike, whether the consideration be expressed or not; *B'k. C. Fear* v. *Edwards,* 5 Ire. 516; *Mills* v. *Williams,* 11 Ire. 558. *Opinion of Ch. J.*

In some Railroad charters, it is stipulated that in case of invasion or insurrection, troops, &c., of the State shall be transported free of charge, as in charter of R. & G. R. R.

Co., act of 1852, s. 9. This is manifestly a consideration for the franchise, though not set forth as such in words. The works and services required to be done by the stockholders are always deemed to be undertaken in consideration of the promises made by the State; and in determining the meaning of the mutual obligations of each, the same rules of construction ought to apply. Such rules are applied in *B'k. C. Fear* v. *Edwards*; *Att'y. Gen.* v. *B'k. of Charlotte*; *St. B'k. of Ohio* v. *Knoop*; By Taney, Chief Justice, in *Life and T. Co.* v. *Debolt*; in *Gordon* v. *Appeal tax Court.*

Every consideration given by the State is intended to secure a public benefit; and the State is entitled to have these benefits substantially rendered, and not merely technically performed: On the other hand, the stockholders, who are induced by the considerations offered to them to invest capital and secure these public benefits, ought to be fairly dealt by and protected in their bargains. This is the only means whereby the sovereign can preserve its honor; or, in time of need, command the wealth of the people.

5. If the grant of exemption from taxation was intended to induce capital to create those public benefits which the State cannot otherwise establish, save by taxation, what is more reasonable, than that, while the capital thus invested relieves the public from being taxed, the capital itself should be relieved?

The general policy of the times when the original charters of these companies were granted, was and long had been to use this way to enlist the private wealth of the people. See the following charters for building highways:

Dismal Swamp Canal Co., 1790. s. 8; Buncombe Turnpike Co., 1824, s. 7; Portsmouth & R. R. R. Co., 1832; Louisville, Cin. & Ch. R. R. Co., 1835, s. 43; Roanoke, D. & J., 1835, s. 13; N. C. Central R. R. Co., s. 14; C. F. & W. R. R. Co., 1836, s. 12; Raleigh & G. R. R. Co., 1836, s. 27; Norfolk & Edenton R. R. Co., 1836, s. 11. Many others might be cited.

In some charters, other and different provisions, having the same tendency to enlist capital, are employed; as in the Fayetteville & W. R. R. Co. 1833, s. 5, and in the C. F. Y. & Pedee R. R. Co. 1834, ch. 53. where very large tolls and freights are allowed, until the entire capital shall be repaid.

Provisions similar to both classes above stated, are to be found in the various charters granted by the State from 1790 to 1860. While in many charters granted during this long period there is no exemption or special privilege granted.

It is impossible to suppose that the General Assembly did not intend something by these provisions so carefully inserted in some charters, and altogether omitted or varied in others, during a period of seventy years.

The history of the W. & W. R. R. Co. fully illustrates the propriety and advantage to the State of this exemption.

The W. & W. R. R. Company have run their road for 32 years, and never declared a dividend, and is not likely to get one in 30 years more. During this long period the public has had the full benefit of the work, without taxation. The only sufferers are the capitalists, whose stock now bears a loss of sixty per cent., and is still further depressed in price by the unexpected burthen.

6. Unless the provision of exemption be wholly rejected, the tax imposed is in violation of the charter. It declares that " the property of said company and the shares therein shall be exempt from any public charge or tax whatever," after having before declared that all the property purchased by the company " or given " to it, "and the works " constructed by virtue of the charter, and all profits accruing on said works and the said company, shall be vested in the respective shareholders of the company. Whatever is the *property of the company*, or constitutes the *shares* of the shareholders, is included in the exemption. It is declared that the share of the shareholder shall embrace the property *purchased*—the property *given*—the *works* and the *profits*.

The *property* of the company embraces the *franchise,* which is defined by Redfield, in *Thorp* v. *Rutland* R. R. Co. 27, Verm. Rep. 140, to be " the privilege of operating the road and taking fare and freight.

The franchise is a vested *property,* springing from the charter, 1 Am. L. Rev. 471—2. *Gordon* v. *Appeal Tax Court,* 3 How. 133 at 150.

If a franchise be taken to construct a railway it must be paid for as property. Redfield on Railways p. 129, § 70. Ang. & Ames Corp. § 4 and § 737.

7. It is no argument to say that the exemption is against public policy—that is a matter of speculation in each case. If the public needed the railroad, and, instead of collecting taxes to build it, procured citizens to build it, and paid them by exemption from tax, this is substantially building it by taxation.

8. Nor is it any argument to say that, if built by such means, the taxation is unequal: for by the constitution of 1776, the State was under no obligation to raise tax by an *ad valorem* rule. It might have levied the whole tax from property or poll, from real estate or personal estate. *Taylor* v. *Comm'rs of Newbern,* 2 Jo. Eq. 141, at 145 *et. seq.*

9. Besides, even if the exemption from taxation were an " exclusive or separate emolument, or privilege," it is given in consideration of public services—the grant of them is matter of legislative and judicial inquiry. *Yadkin Nav. Co.* v. *Benton,* 2 Hawks 10; *Davis* v. *R. & G. R. R. Co.,* 2 D. & B. 451. Such considerations are recognized by the constitutions of 1776, s. 3—and 1868, s. 7 Decl. of Rights.

1. The argument so far, embraces the case also, of the Raleigh and Gaston Railroad Company. This company was chartered in 1835.

Section 25 provided that "(1) all machines, wagons, vehicles and carriages purchased with the funds of the company, or engaged in the business of transportation on said railroad, and (2) all the works of the said company constructed, or

property acquired under the authority of this Act; (3) and all profits which shall accrue from the same, shall be vested in the respective stockholders of the company forever, in proportion to their respective shares; and the same shall be deemed personal estate, and shall be exempt from any public charge or tax whatsoever, for the term of fifteen years; and thereafter, the legislature may impose a tax not exceeding twenty-five cents per annum per share, on each share of the capital stock whenever the annual profits shall exceed six per cent."

2. In 1838, ch. 29, the Company borrowed $500,000, and gave the State for security, and a mortgage on the Road.

It failed to pay the money, as it became due, and by act of 1844, ch. 73, the mortgage was directed to be foreclosed, and the road, with all its property, was sold, and bought by the State.

In 1848, ch. 82, sec. 45, an attempt was made to place the Raleigh & Gaston Railroad under an incorporation, which was without success.

3. In 1850, ch. 123, the Road was chartered anew, with section 7, requiring the free transportation of troops in case of domestic invasion or insurrection. Section 8 (similar to section 25, in the charter of 1835,) was introduced, and is a copy of section 8, of the charter of 1852, hereinafter recited.

In 1852, ch. 140, the charter was amended, and the amended charter stipulated anew, for the transportation of troops, and munitions of war, free of charge, in case of domestic invasion or insurrection; and by Sec. 8, it was provided "that, (1) the said Railroad, and all engines, cars and machinery, (2) and all the works of said Company, (3) together with all profits which shall accrue from the same; and, (4) all the property thereof, of every description, shall be vested in the said Company, one-half thereof to the use and benefit of the State, and the other half to the use and benefit of the individual stockholders, and the same shall be deemed, and held to be, personal estate, and shall be exempt from

any public charge, or tax, whatsoever, for the term of fifteen years, and thereafter the Legislature may impose a tax, not exceeding twenty-five cents per annum, on each share of the capital stock held by individuals, whenever the annual profits do not exceed 8 per cent."

The annual profits have never reached eight per cent.

5. In the year 1866, an ordinance of the Convention provided that "the State might sell any of its stock in Railroads on its lands, provided the said stocks and bonds were sold, or exchanged at par."

And, in pursuance of this authority, the stock of the State in the Raleigh & Gaston Railroad Company was bought by the Raleigh & Gaston Railroad Company, and ever since, the State has had no interest in the stock of the said Road. See Ordinance, ch. 34, 15th. June 1866.   Acts of March 4 1866, ch. 119.

PEARSON, C. J.   This case falls under the principles set out in the Opinion delivered at this term, in *Raleigh and Gaston R. R. Co.* v. *Reid.* The discussion is made in that case, for it seemed to be considered, on the argument, as the one of the most difficulty.

By its charter, the Wilmington & Weldon Railroad Co. has a *franchise*; and a provision is inserted therein, that "the *property* of said company, and the shares therein shall be exempted from any public charge or tax whatsoever:" *Non constat*, that the *franchise* is not the subject of taxation; and the fact, if it be so, that the *property* of said company is exempted from liability to taxation for all time to come, only makes the *franchise* so much the more valuable, and, on the *ad valorem* mode of taxation, there can be no difference.

The order in the court below is reversed.

This will be certified.

PER CURIAM.                              Reversed.